# EXHIBIT A



**AMD** anders minkler & diehl llp

**CPAs + Consultants**

December 22, 2009

Sarah W. Rubenstein, Esq. and Robert L. Devereux, Esq.
Devereux Murphy LLC
190 Carondelet Plaza, Suite 1100
St. Louis, MO 63105

RE: Secure Energy, Incorporated and Secure Energy Decatur, LLC v. Coal Synthetics, LLC, et. Al.

Dear Ms. Rubenstein:

At your request I have reviewed the Expert Rebuttal Report of Mark E. Hoffman, dated November 13, 2009 ("Hoffman Report") submitted in the above referenced case. This report was submitted by the Defendants in response to the Expert Report of G. William Kennedy, Ph.D., CPA/ABV, ("Kennedy Report") submitted in this case. I provide the following comments and observations regarding the three opinions offered in the Hoffman Report.

1. The Hoffman Report first opinion states: "The forecasts that are the basis of Dr. Kennedy's opinion of value are not reliable."[1]

The Hoffman report opinion stated above is false and misleading. The forecasts that formed the basis of the opinion offered by me were prepared by the management of Secure Energy ("the company") in the ordinary course of business prior to the commencement of this litigation and would represent their best assessment of the prospects for the company at that time they were prepared. The management of the company would be in the best position to know the operations of the business and therefore provide a reliable and credible forecast of the business incorporating information that was known or knowable at the time of the forecast.  These forecasts were examined and found to be mathematically accurate and consistent with the assumptions that were disclosed in connection with the forecasts.

The Hoffman report states that the forecasts "are inconsistent" and by so stating, Hoffman failed to observe that the company management prepared two credible forecasts that were reasonably based on two different levels of plant utilization and ramp up time to achieve full production. It would be common practice for a company's management to produce forecasts for alternative scenarios of production levels, and it is reasonable and credible for management to make such assumptions regarding plant utilization and ramp up time and the forecasts prepared by the company's management provide a consistent and reliable basis for the damages calculations performed by me.

---

[1] Hoffman Report, Page 6.

The Hoffman report states that "Dr. Kennedy does not appreciate SEI's inability to obtain the necessary financing to construct a coal gasification plant."[2] In connection with this statement, the Hoffman report cites a letter from the Department of Energy to Lars Scott that rejected SEI's financing guarantees. This statement is a red herring in that the issues presented surrounding the availability of financing for the project were not known or knowable at the time the trade secrets were misappropriated and qualifies as a subsequent event. Along the same lines, the Hoffman report makes a criticism of the forecasts used through a comparison to a subsequent forecast dated March 2009[3]. Section 43 of the AICPA Statement on Standards for Valuation Services states:

> "The valuation date is the specific date at which the valuation analyst estimates the value of the subject interest and concludes on his or her estimation of value. Generally, the valuation analyst should consider only circumstances existing at the valuation date and events occurring up to the valuation date. An event that could affect the value may occur subsequent to the valuation date; such an occurrence is referred to as a subsequent event. Subsequent events are indicative of conditions that were not known or knowable at the valuation date, including conditions that arose subsequent to the valuation date. The valuation would not be updated to reflect those events or conditions. Moreover, the valuation report would typically not include a discussion of those events or conditions..."

In addition, any uncertainty regarding the realization of cash flows anticipated from the subject trade secrets has been considered in my use of a high discount rate (as discussed later in this report).

The Hoffman report also states that "Dr. Kennedy's first mover assumption is not supported by evidence"[4], a false statement, as Secure Energy was the first to purchase and receive delivery of the Siemens Gasifiers in North America. In connection with this purchase, Secure energy was also the first to receive and further develop the appropriate engineering package to apply to the use of the Siemens Gasifiers to convert coal into various value added products.[5]

    2. The Hoffman Report second opinion states: "Dr. Kennedy's valuation methodology is not reliable."[6]

The Hoffman Report description of my damages calculation and valuation methodology is oversimplified and highly misleading. With support from treatises on the determination of royalty rates for intellectual property widely used in the profession, I started the damages calculations by estimating a reasonable royalty rate for the subject trade secrets by taking twenty-five percent of the management's forecasted operating profits. After determining an estimated royalty stream from the Plaintiff's intellectual properties, I calculated the resulting royalty rate by comparing the calculated royalty income to the forecasted sales revenues, the resulting royalty rates (7.9% - 8.9%) were determined to be a reasonable and in fact conservative royalty rate for

---

[2] Hoffman Report, page 8.
[3] Hoffman Report, page 13
[4] Hoffman Report, page 14
[5] Secure Energy Inc. Management.
[6] Hoffman Report, page 6

trade secrets. Hoffman Report completely ignores this analysis and the reasonable results it produces in its comments.

The Hoffman report also states that I "did not use, but could have used the cost approach which would invalidate his rule of thumb conclusion".[7] The cost approach is virtually irrelevant in a trade secret setting in that typically a trade secret represents the accumulated facts, knowledge, or processes that have arisen out of investment of time, labor, or money that others have not or would not be able to easily reproduce. These investments (what the cost approach would have you measure) are sunk costs and are irrelevant to the potential income producing nature of the trade secret.

The Hoffman Report provides highly misleading and erroneous comments that the Kennedy analysis "has not identified a trade secret."[8] In fact, my report did provide a description of the trade secrets that were the subject of his damages analysis.[9]

> In the process of establishing its coal gasification business in Decatur, Illinois, SEI has developed a valuable collection of trade secret information. Such trade secret information was acquired over the course of several years, through SEI's painstaking investigation of the coal gasification process. Coal gasification is a fledgling industry in the United States, and SEI required more than $43,000,000 in expenditures to advance the Decatur project to the present stage of development. The SEI design block used at the Decatur Plant can be replicated for use on other sites for the production of methanol, fertilizers, gasoline, diesel fuel, jet fuel, natural gas, hydrogen, electricity or other high value products[10]. At its essence, SEI is focused on the conversion of gasified coal to higher value commodities while producing limited regulated emissions.
>
> SEI's trade secret information includes, but is not limited to the following assets:
> - Identification and evaluation of plant locations;
> - Financial modeling;
> - Development of engineering plans and specifications;
> - Business plan;
> - Identification and development of a worldwide vendor network (including Germany, Canada, Russia, France, China, United Kingdom, India and the United States); and
> - Development of necessary project bidding estimates.
>
> SEI trade secret information was developed after much trial and error, and at great expense. The trade secret information also has an independent economic value to anyone interested in establishing a coal gasification plant. Knowledge of SEI trade secrets would allow a developer to save years of trial and error and substantial sums of money.

---

[7] Hoffman Report, page 18.
[8] Hoffman Report, page 7.
[9] Kennedy Report, page 2.
[10] Secure Energy, Inc presentation (SEI-797)

The Hoffman Report also comments within its second opinion that "Dr. Kennedy does not take into account the lack of marketability of the alleged trade secret."[11] A trade secret has value to the holder of such trade secret in that its anticipated commercialization and use was to result in cash-flow to the holder of the trade secret. The risks to such commercialization and the ultimate realization of such cash flows is incorporated in our analysis through the use of a high discount rate (discussed further below). The Hoffman Report does not provide any support for its assertion that a discount for lack of marketability is applicable to the subject trade secrets, nor am I aware of any treatises or publications that support the application of a discount for marketability in an intellectual property setting. I am of the opinion that a discount for lack of marketability is not applicable to the subject trade secrets.

The Hoffman Report's other comments within its second opinion regarding the discount rate used in my report is that the discount rate "is not appropriate for the alleged trade secret."[12] This criticism has no basis or support; it is well established in business valuation literature that the higher the risk of a business or project the higher the discount rate applied to the business or project's forecasted earnings. The discount rate used in my report (35%) is a high discount rate, which results in a lower and therefore conservative calculated lost profit damages. This rate is consistent with realized rates of return observed in venture capital markets for Seed/Early Stage companies.[13] The rate is high by comparison to ordinary discount rates determined by reference to the standard data sources for discount rates relied upon by business valuation professionals (e.g. standard discount rate build up method using commonly relied upon sources for the development of discount rates would result in a discount rate of 10% - 12% for larger companies, 16% - 18% for smaller companies).

   3. The Hoffman Report in its third opinion states: "Dr. Kennedy's stated methodology fails professional standards."[14]

This third Hoffman opinion is completely without merit and lacks any credible support and is false and misleading. I did in fact evaluate the reliability of the management's forecast that was the basis for his damages calculations. The methodologies used to determine damages by me are supported by the literature in the field of business valuation and intellectual property valuation and damages. My report did in fact identify the trade secrets that were the subject of his damage calculations. I did consider the range of valuation approaches and methods recommended to be considered by the literature that is commonly referred to in the business valuation profession, and I did prepare and maintain proper support for my analysis.

Respectfully submitted,

ANDERS MINKLER & DIEHL LLP

G. William Kennedy, Ph.D., CPA/ABV
Partner

---

[11] Hoffman Report, Page 22
[12] Hoffman Report, page 7.
[13] AICPA Practice Aid - Valuation of Privately-Held-Company Equity Securities Issued as Compensation, page 48.
[14] Hoffman Report, page 7.