*IN THE MATTER OF:*

# Secure Energy v. Coal Synthetics

*Cause No. 4:08-CV-01719-JCH*

**Deposition of G. William Kennedy**
**10/23/2009**

**Gore Perry Gateway Lipa Baker Dunn & Butz**
**Certified Court Reporters & Legal Videographers**
**1-800-878-6750**

**Full GLOSSARY included with this DepoScript**

1   but generally can you tell me how many times you've

2   testified about the valuation -- strike that.

3          How many times have you done analysis for

4   litigation and provided testimony about the

5   valuation of intellectual property?

6       A:   I don't have a count off the top of my

7   head.

8       Q:   Let's try it this way.  Of the

9   approximately 50 percent over time -- the period of

10  time that your work is devoted to litigation

11  support, how much of that work is devoted to

12  analysis and testimony of the valuation of

13  intellectual property?

14      A:   This would be just a rough, rough

15  estimate.  I'd say 10 percent, and I don't know that

16  I've got a good basis for saying that.  It's just an

17  element of the various types of valuation matters

18  that I've testified to in litigation.

19      Q:   Would it be fair to say that you

20  understand your work in this case to involve the

21  valuation of intellectual property?  Is that the

22  concept?

23      A:   Yes, sir.

24      Q:   Do you have any other matters going on

25  right now that you're involved in the valuation of

CONFIDENTIAL

DepoScript3

1    intellectual property?

2         A:   A matter going on right now that involves

3    the valuation of intangible assets.  Intellectual

4    property is a category of intangible assets.

5         Q:   What's the intangible asset in the other

6    case?

7         A:   Wide variety of typical intangible assets

8    that a company might possess.  Customer base, trade

9    name, trademark, patents, the -- the broad sweep

10   of --

11        Q:   I would typically -- I didn't mean to

12   interrupt you.  Go ahead.

13        A:   Just the broad sweep of what I could

14   characterize as identifiable intangible assets.

15        Q:   I would typically identify or categorize

16   patents, trademarks, trade names as intellectual

17   property.  I take it you do not?

18        A:   I'm not sure why you say that.  No, I

19   would characterize patents, trademarks, and --

20        Q:   I think maybe we're not meeting here.  I

21   thought you were involved in something other than

22   intellectual property; you were involved in some

23   kind of intangible asset that wasn't intellectual

24   property in that other matter.

25        A:   I think what I said was the other matter

CONFIDENTIAL

```
 1     appear on pages -- the applications that appear on

 2     pages 7 and 8?

 3          A:   You asked me about -- and the underlying

 4     calculations for those.

 5          Q:   Oh, you mean the Secure Energy model?

 6     When you say the "model," what are you talking

 7     about?

 8          A:   My Excel spreadsheets.

 9          Q:   Your Excel spreadsheets.  I didn't see

10     those.  They're not here, right?

11          A:   I didn't print screen shots, no.

12          Q:   What is that model?  Tell me about that

13     one.

14          A:   What we did was replicate in Excel the

15     financial forecasts that were presented by both

16     Secure Energy and Coal Synthetics in these series of

17     documents that I have in the binder and then added

18     to that the computations we presented in my report

19     and tables 1 and 2 and 3 plus described in terms of

20     rates of return, discount rates that we used, so

21     it's the computation that ultimately gave us these

22     tables 1, 2, and 3 in my report.

23          Q:   When you say you started by replicating

24     the forecasts that Secure had used in the other

25     documents, what do you mean by that, by replication?
```

CONFIDENTIAL

1     don't recall that we replicated the balance sheets.

2     I normally would not have.  And then some of the

3     underlying detail, for example, maintenance and

4     catalyst costs which are page 9 in the index, we

5     wouldn't have replicated that.  We would have

6     replicated it at the income statement level.

7          Q:  Okay.  Let's go to -- you said page 4.  I

8     have that as SEI-5849.  Do I have that correct?

9          A:  Yes.

10         Q:  Okay.  And as I understand what you're

11    saying, you replicated this entire spreadsheet in

12    your Excel spreadsheet; is that right?

13         A:  Yes.

14         Q:  Okay.  All of the data here was keyed in

15    or did you get an electronic copy somewhere?

16         A:  I'm sorry, say it again.

17         Q:  Was all of the data on SEI-5849 keyed into

18    your spreadsheet or did you get an electronic copy

19    from somewhere?

20         A:  No, what we received were these PDFs.  You

21    can't move from a PDF into an Excel, at least in the

22    PDF we received, so these were rekeyed.

23         Q:  Rekeyed by someone at your place?

24         A:  Yes.

25         Q:  And you said you did 5849 and I think you

CONFIDENTIAL

1    said you did 5854?  Did I have that right?

2         A:    5854, I don't --

3         Q:    Isn't that the maintenance and operations?

4         A:    Yes.  I use that as an example of one we

5    would not have.

6         Q:    I'm sorry.

7         A:    So 5854 -- so 5849, 5850 as an example of

8    what we would have --

9         Q:    Okay.

10        A:    -- would have keyed in.

11        Q:    How about 5852?  Did you have any interest

12   in that?

13        A:    I'm sorry.  I didn't quite understand the

14   question.  Did I have an interest in it?

15        Q:    Did you have that keyed into your new

16   spreadsheet?

17        A:    Okay.  I heard that question differently.

18        Q:    Yeah, what I said was did you have an

19   interest in it.  What I meant was I assumed you were

20   keying into your spreadsheet items that were of

21   interest to you.

22        A:    We were keying into our spreadsheet what

23   would allow us to come to income numbers, so this

24   may have had some interest to me and I did review

25   every page of every document that we've got in all

CONFIDENTIAL

DepoScript3

1    of these binders.  But I don't believe that found

2    its way on to this spreadsheet because it was just a

3    subpart that drives to -- we weren't trying to

4    replicate this entire model.  We were trying to

5    replicate in Excel so we could work with it, the

6    income and cash flow numbers that were important to

7    the valuation process that we were going through.

8         Q:   That's what I meant when I asked you

9    originally by what do you mean by "replicate."  You

10   were replicating those parts that would be used

11   specifically in your model?

12        A:   That's correct.  Keying into our Excel

13   spreadsheets so we could do math.

14        Q:   Is it fair to say that most of the stuff,

15   most of the numbers on 5849 were not necessary for

16   your model?  In other words, there are baseline

17   numbers that you could have drawn out and just

18   plugged into your model, right?

19        A:   There's a number of different ways you

20   could have gone about it.  But we keyed in this data

21   to give us the income statement information.

22        Q:   Let's try it this way.  Why don't you turn

23   to page 7 of your report which is Exhibit 1.  And

24   just take the top left number, top left dollar

25   number in table 1 there, "Earnings Before Taxes,"

CONFIDENTIAL

1 here -- 49 and 50.

2  Q: Okay.  Did you check any of the

3 assumptions about the data in the forecasts that

4 ended up in 5849 and 5850?

5  A: We discussed these forecasts during our --

6 during our meetings to gain an understanding of what

7 was being forecasted.  The -- some of the other

8 documents that are presented here gave --

9 additionally gave color and flavor and description

10 of, you know, assumptions were embedded in the

11 forecasts, so it was all part of the review process.

12  Q: What documents in your binder there gave

13 color, flavor, and description to those two lines

14 from 5849 or 5850?

15  A: Well, it gave color and forecast to --

16  Q: Color and flavor.

17  A: Did I say flavor?

18  Q: You said forecast.

19  A: To the whole of the -- to the whole of the

20 set of assumptions that were underlying those --

21 those forecast documents that we were looking at.

22  Q: Can you point to anything specific that

23 said, yep, that's why this is right; this forecast

24 is valid?

25  A: What I said was color and flavor.  It was

CONFIDENTIAL

DepoScript3

1    a description of the business plan.  There's an

2    offering memorandum -- I'll call it an offering

3    memorandum in here, the presentations, the Power

4    Point presentations describing what Secure Energy

5    was -- what their business plan was all about.  I

6    think we had referenced --

7        Q:   Maybe we can -- if you can slow down we

8    can identify the document you're talking about.  You

9    said an offering memorandum or did you have

10   something else you said first?

11       A:   What I'm going to do is go through my

12   binder and just name the documents that we looked

13   at.  The DAI Management Consultant document that we

14   talked about.

15       Q:   Dated?

16       A:   This is July 16th, '07.

17       Q:   Let me stop you on that one just real

18   quick.  Did you check the data in the July 16th,

19   2007 against any of the data in the May 23, 2008

20   financial model?

21       A:   It wasn't an exercise that lended itself

22   to monotonic data checking.

23       Q:   My answer -- the answer to my question is

24   no, you did not?

25       A:   Because it wasn't a process that was --

CONFIDENTIAL

1    the costs?

2        A:   Well, as I have told you, I reviewed every

3    page in these binders in detail.  I see that the

4    financial forecasts that were here included

5    assumptions.  In terms of verification, again, it's

6    a forecast.  It isn't like an audit where we can go

7    in and vouch payroll or vouch, you know, vendor

8    payments.  It seemed reasonable.  It seemed very --

9    it was very detailed, very thorough in its

10   construction.  There was a discussion about head

11   count during construction period, during the

12   operating period, and it seemed like a very

13   detailed, well-thought-out, well-constructed

14   forecast, and in my judgment it was reliable.

15       Q:   Is this forecast typical of the kind of

16   forecast you see for an enterprise involved in this

17   kind of work?

18       A:   This -- involved in this kind of work

19   being putting together financial forecasts, this was

20   a very thorough, very detailed financial forecast,

21   and typically what I see is much less so, you know,

22   summary level sales dollars, percent growth year to

23   year, and some, you know, operating expenses in

24   broad aggregates.  No, this was a very, very

25   thorough, detailed forecast, much better than

CONFIDENTIAL

DepoScript3

1    95 percent of what else I see.

2        Q:   And that's true of each of the forecasts

3    you looked at for these folks?

4        A:   Well, their -- their modeling clearly is

5    the same model.  I mean, you can follow the page and

6    the structure and the format, so, you know, it

7    certainly implied to me that there was a very

8    thorough process that had gone on in terms of

9    considering all of the various details of -- that

10   comprised each of the line items.  There are

11   supporting pages for each of the categories, so they

12   get an A in my class for this work.

13       Q:   Okay.  When you say each of the models,

14   are you talking about each of the two models in

15   May 2008 or the models in 2006, 2008, or 2009?

16       A:   Well, there's a number of different

17   models.  The framework and the architecture of the

18   models if you look at the pages, they appear to be

19   the same.

20       Q:   Okay.  The inputs would be different?

21       A:   Well, the inputs were different, yes.

22       Q:   Do you know who RW Beck is?

23       A:   It's not ringing a bell.

24       Q:   Did anybody ever mention to you in your

25   work in this case a criticism of the financial

CONFIDENTIAL

1       A:   Well, we pushed the cash flow out three

2    years in time before we applied the discounting, and

3    we used a very heavy discounting rate, so that's

4    going to convert a dollar to substantially less than

5    that in the damage calculation.

6       Q:   Is that why you pushed it out because of

7    difficulty in obtaining financing?

8       A:   No, more to account for the -- for the

9    construction process that I understood may be about

10    a two year, maybe a two year and change, two year

11    and a couple months, and we just pushed it out three

12    years to be conservative.

13       Q:   But if they're not getting financing

14    they're not getting construction under way, it's

15    getting pushed out further, right?

16       A:   Well, my mission here was to value the

17    trade secrets of SEI and the value of the assets

18    separate from specifically this project, is my view

19    of that.

20       Q:   The value of the assets separate from the

21    project?

22       A:   Well, the trade secret -- this is a value

23    of an asset.  The asset is the trade secrets of SEI

24    and the fair market value of that, so in my view, it

25    isn't specifically dependent upon, you know, a

CONFIDENTIAL

DepoScript3

1    finite start date for construction to give an

2    opinion as to what the value of these trade secrets

3    are.

4         Q:   Okay.  And if they never obtain financing

5    and there never is construction, that would not have

6    an impact on your valuation?

7         A:   That's not to say that the trade secrets

8    themselves don't have value.

9         Q:   But the inability to get financing for

10   them for the application of the trade secret would

11   have an impact on value, would it not?

12        A:   Not on the -- not on the separate asset of

13   the trade secrets.  It's the value of the assets in

14   the marketplace as opposed to the value of the

15   assets in the hands of -- that's -- we're getting

16   very esoteric here, but that's a fair market value

17   concept.

18        Q:   Well, wait a minute.  You derived the

19   value from a projection of the construction and

20   operation of this particular plant, right, not from

21   any plant in the marketplace.  One plant, right?  If

22   that plant --

23        A:   Which --

24        Q:   No, go ahead.  I don't mean to interrupt

25   you.  Is that right?

CONFIDENTIAL

DepoScript3

1    was overstated on cost -- I'm sorry, understated on

2    cost or overstated on revenue, it wouldn't make a

3    difference to your valuation of the IP, right?

4        A:   I'm going to come back to the same answer

5    I've given a dozen times now.  I've reviewed it; it

6    seemed reasonable.  It was very thorough, well

7    constructed, well thought through, and a reasonable

8    basis for valuing this -- these trade secrets.

9        Q:   And you would say the same with the Coal

10    Synthetics projection?

11        A:   Coal Synthetics had the same models down

12    to the same formating on some of the pages.  They

13    were much more aggressive on the revenue side.  And

14    as I had indicated, if you put their forecast

15    through the same processes, the value using Coal

16    Synthetics' forecast for the -- it's almost

17    $76 million.

18        Q:   And you would consider that to be a

19    legitimate projection of the value of this

20    intellectual property?

21        A:   My opinion of value that I give in my

22    report was 18 to 24 million which was based on the

23    much more conservative forecasts of SEI and not the

24    more aggressive forecasts of Coal Synthetics.

25        Q:   So it's a difference between the

CONFIDENTIAL

DepoScript3

1          MR. HALLINAN:  I don't know, trade secret

2     expense.

3          THE WITNESS:  Well, if you look in the

4     paragraph in the middle of that page citing out of

5     the complaint, "Coal gasification is a fledgling

6     industry in the United States, and SEI required more

7     than $43 million in expenditures to advance the

8     Decatur project to the present state of

9     development."

10         BY MR. HALLINAN:

11         Q:   Uh-huh.  Do you have any idea how much of

12    that 40 million was advancing the trade secret

13    information, developing the trade secret

14    information?

15         A:   I didn't attempt to parse that out.

16         Q:   Okay.  Does it make any difference to you?

17         A:   No.

18         Q:   In order to determine the reasonableness

19    of your royalty calculation, it does not make a

20    difference to you how much was actually spent on the

21    trade secret information; is that correct?

22         A:   I did look at it more globally in terms of

23    internal rates of return that were presented and

24    that were described in some of the documents.  I

25    didn't review rate of returns because I didn't parse

CONFIDENTIAL

DepoScript3

1    out a dollar to a trade secret versus a dollar to a

2    bucket of bolts and nuts.

3         Q:   So the answer to my question is it didn't

4    make a difference to you?

5         A:   That wasn't part of my analysis, so that's

6    correct.

7         Q:   The cost of development of the trade

8    secrets makes no difference in your reasonable

9    royalty calculation, true?

10        A:   We didn't undertake a cost --

11        Q:   You can't answer that one yes or no; is

12   that correct?

13        A:   We didn't undertake a cost approach.

14        Q:   Tell me first -- you can't or can answer

15   it yes or no?  Why is this causing you so much

16   trouble?

17        A:   I'm trying to recall how you asked -- what

18   question you asked.  I got lost.

19             MR. HALLINAN:  Read the question back,

20   please.

21             (Record read by the reporter.)

22             THE WITNESS:  It didn't play into that,

23   that's true.

24        BY MR. HALLINAN:

25        Q:   In general terms based on your experience
                        CONFIDENTIAL

1    in the industry, does the cost of the development of

2    the trade secrets affect the reasonableness of the

3    royalty?

4        A:   Not necessarily but it could impact the

5    value of the trade secret.  We could have found

6    value of the trade secret based on a cost approach

7    as opposed to an income approach and it would have

8    likely been more.

9        Q:   Why do you say it likely would have been

10   more?

11       A:   If some portion of this 43 million was

12   non-trade-secret related, and I didn't attempt to

13   parse out how much of the 43 million, if that's the

14   number we'll be using, was or wasn't.

15       Q:   What if 42,500,000 was attributable to

16   non-trade secret expenses?

17       A:   Okay.

18       Q:   That would make your reasonable royalty

19   calculation a little bit overstated, right?

20       A:   No, not at all.

21       Q:   $500,000 for the expenditure to acquire

22   reasonable -- or to acquire trade secrets would

23   result in $18 million in value for your trade

24   secrets?

25       A:   Because that's the earnings that those

CONFIDENTIAL

DepoScript3

1      MR. HALLINAN:  State it and we'll move on.

2      MR. DEVEREUX:  Thank you.  There are so

3  many pieces to that question, it would be impossible

4  to answer it.  You include five subject matter

5  aspects to that question.

6      BY MR. HALLINAN:

7      Q:  Are you familiar with restrictions on the

8  period of time in which a damage analysis for a non

9  or anticompetitive situations can be calculated?

10      A:  That's very broad.  I've got bookshelves

11  full of books on treatises on valuation of

12  intellectual property and intangible assets and we

13  consulted those.  I can't say that I have a treatise

14  that I could point to that would answer yes to your

15  question.

16      Q:  As you sit here today you're not familiar

17  with the concept of limiting the damage period by

18  the amount of time it would take a participant to

19  enter the market?

20      A:  Not specifically.

21      Q:  Okay.  That's all I was asking.  How long

22  do you think it would take to enter the market?

23      A:  I think five years is a reasonable

24  estimate.  But I think it's a reasonable approach to

25  the value of these trade secrets.

CONFIDENTIAL

1        Q:   You understand that SEI entered the market

2    in three years; is that right?

3        A:   No.

4        Q:   You understand that SEI developed the

5    volume of trade secrets that was stolen in three

6    years or less, right?

7        A:   Well, we've been looking at the dates of

8    founding in 2005 and the October 2008 date when the

9    discovery of the theft of the trade secrets

10   occurred, and then you've got a two to three -- two,

11   two-and-a-half-year construction period included as

12   well, so that certainly gets you to five.

13       Q:   Wait a minute.  Your five-year period

14   doesn't start running until after construction is

15   completed, so your five-year period if you're going

16   to include construction is eight years; isn't that

17   true?

18       A:   Maybe I should -- I mischaracterized the

19   answer, but it's my opinion --

20       Q:   You were mistaken?  It wasn't five years;

21   it's eight years if you're going to include the

22   construction period?  Having trouble with that

23   question?

24       A:   No, I'm not having trouble with that

25   question, sir.  It's my opinion that five years was

CONFIDENTIAL

DepoScript3

 1   a reasonable royalty period to determine the value

 2   of the trade secrets.

 3        Q:   Other than your ipse dixit that's the

 4   reasonable period, do you have anything you can

 5   point to that would say that that's a reasonable

 6   period?  Any other measure, any other -- anything

 7   else you can point to?

 8        A:   Well, I didn't bring my library with me

 9   that gives us guidances as accountants on how to

10   determine value of trade secrets, so we didn't

11   consult with a -- our library, so -- it was

12   reasonable to me based on the research that we were

13   doing on how to go about determining the damages or

14   value in this case.

15        Q:   Why don't you put your library references

16   for the five- or eight-year period in your report?

17   You put it for other things that you got out of the

18   library.

19        A:   Didn't occur to me.

20        Q:   As we sit here today, we have nothing but

21   your word, your ipse dixit that it's five to eight

22   years, right?

23        MR. DEVEREUX:  It mischaracterizes the

24   evidence.  He said it was five years.

25        THE WITNESS:  I --
                    CONFIDENTIAL

DepoScript3

1        MR. HALLINAN:  Or eight if you include the

2    construction.

3        THE WITNESS:  I used a five-year period of

4    royalty to quantify the value of the intellectual

5    property in this case.

6        BY MR. HALLINAN:

7        Q:   That's not the period to enter the market;

8    that would also include the construction period too

9    which would be eight years, right?

10       A:   So what are you doing, adding five years

11   of forecast and two years of construction?

12       Q:   Uh-huh.

13       A:   That's seven.

14       Q:   Seven, okay.

15       A:   I'm not sure what that means though.

16       Q:   Neither am I.

17       A:   You're confusing me.

18       Q:   What's the five -- how did you determine

19   the five-year royalty period?  You got a library

20   book, right?

21       A:   First and foremost it was -- as I said, we

22   looked at it against a five-, a ten-, and a

23   fifteen-year period.  I had to make some judgments

24   about what I thought was reasonable.  We consulted a

25   number of the books that we had in our library about

CONFIDENTIAL

1      what was reasonable in terms of damages for theft or

2      trade secrets, and I came down on the judgment that

3      it -- we'd use a five-year period rather than a ten

4      or fifteen.

5          Q:   You also reference the state of

6      development of the coal gasification industry in the

7      United States as a reason for using the five-year

8      period.  Do you see where I'm at on page 6?

9          A:   I do see that.

10          Q:   What is the state of development -- the

11      current state of development of the coal

12      gasification industry in the United States?

13          A:   It's my understanding that for the

14      particular part that was purchased from Siemens

15      there's only been about five or six or seven of

16      those sold worldwide that would be part of the plant

17      design.  The -- just part of the background

18      information that we looked at or that I

19      characterized at the very beginning of the day

20      looking at web site research, and we had an SEC

21      filing of a company that was in the industry doing,

22      you know, subtly different things with their plant

23      designs and so on.  Statement about the background.

24          Q:   Okay.  So you're saying that there are

25      five to seven gasifiers purchased from Siemens; is

CONFIDENTIAL

DepoScript3

1    observed in the venture capital markets."  Have I

2    read that correctly?

3        A:   That's what it says.

4        Q:   Where would I go to -- where would I go to

5    observe typical venture capital market rates of

6    return?

7        A:   I've got some studies on that.

8        Q:   The studies typical -- strike that.

9           Do venture capital market rates vary?

10        A:   They certainly can.

11        Q:   How do you define "typical" when you have

12    varying rates in the market?

13        A:   Studies I've read is that VC rates were

14    centering around 35 percent.  You know, I'm very

15    comfortable with a 35 percent rate because it is so

16    high.  You know, you've got a risk premium -- if you

17    decompose the number, you've got a risk premium of

18    24 percent which is an extremely high risk premium

19    by any measure of pure CAPM with a Beta of 4 or

20    however you wanted to get to it so...

21        Q:   Are you aware that financing for this

22    project was difficult to obtain prior to 2008?

23        A:   I've seen the documents with multiple

24    requests for financing.

25        Q:   Are you aware that two private equity

CONFIDENTIAL